In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00018-CV
IN THE INTEREST OF M.B.L.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 20-10-12025-CV

## MEMORANDUM OPINION

After a bench trial, Appellant R.P. ("Renae") appeals the trial court's order terminating her parental rights to her child M.B.L. ("Martina").[1] At the time the lawsuit began, Martina was three years old. In a single issue on appeal, Renae challenges the sufficiency of the evidence that termination of her parental rights was in Martina's best interest. For reasons explained below, we affirm the trial court's judgment.

---

[1] To protect the identities of the minor, we use pseudonyms to refer to her and her family members. *See* Tex. R. App. P. 9.8(b)(2).

Background

On October 2, 2020, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. The petition named Martina as the child in the suit, Renae as Martina's mother, and it named Teddy as Martina's father and Damon as Martina's alleged father.[2]

The petition was supported by an affidavit from Child Protective Services ("CPS") stating that, on September 30, 2020, the Department received a report of neglectful supervision by Renae of Martina and of Renae's two older children, Amy and Elise.[3] The report alleged that Renae had approached a neighbor for help because Renae had locked herself out of the house, and the neighbor reported that Renae was confused and disoriented, had an altered mental state, and said "she thought she was an alien." Another neighbor reported an earlier instance when Renae left Martina at home alone, and another neighbor reported that Renae used drugs, including kratom. Amy told the CPS worker that Renae was acting like she was dreaming. Elise told

[2] In its Order of Termination, the trial court found that both the presumed father and alleged father "although duly and properly notified, did not appear and wholly made default." The order also terminated their parental rights to Martina. Neither the presumed nor alleged father is a party to this appeal, and we discuss them only as necessary to explain the background and evidence.

[3] Amy and Elise are not the subject of this appeal, and we mention them only as necessary to explain the background and evidence.

the CPS worker that Renae drinks wine and is sometimes moody. The CPS worker met with Martina's maternal grandmother Serena, who stated she thought Renae was depressed, and she had a history of mental health issues and drug abuse, but she had not managed her mental health because she did not have Medicaid.

When the CPS worker met with Renae, Renae said she had been diagnosed with ADD, depression, and anxiety. Renae reported that she had been lonely and depressed since breaking up with her partner about a year and a half prior, and she had a "mental breakdown" because of Amy's health issues. Renae also told the CPS worker she had no car and was "stuck in the house" with her children. Renae admitted she used kratom, but she stated it had been a long time since she had used "illegal drugs," and she said it had been a year-and-a-half since she had taken prescription medication. Renae also stated she had spent a night in the hospital, and when she was released, she was instructed to follow up with mental health services.

The affidavit reported previous CPS history dating back to 2014, when Renae tried to commit suicide by overdosing on medication. Other incidents included reports of neglectful supervision because of methamphetamine and marijuana use; multiple referrals alleging sexual abuse, physical neglect, and neglectful supervision of the children; concerns about a sex offender having access to the children; neglectful supervision because of Renae's use of drugs with her boyfriend; and neglectful supervision when Renae said her children were dead to her, she was being

3

hypnotized by police and ambulance sirens, she did not know if her children were real, and she was "shooting up meth." The affidavit also reported Renae's history of criminal charges for misdemeanor assault, misdemeanor theft, and felony burglary of a habitation.

Evidence at Trial

Testimony of Giselle

Giselle testified that she was a friend of Renae's, her husband was the father of Renae's daughters Amy and Elise, and she is stepmother to Amy and Elise. According to Giselle, Amy and Elise were seven and nine years old at the time of trial, Martina was four years old, and Giselle was familiar with all of Renae's children. Giselle testified that her husband Brandon had sole managing conservatorship of Amy and Elise, who were living with Giselle and Brandon at the time of trial. According to Giselle, she and Brandon requested that Renae's visitation with the girls be supervised "[b]ecause of her mental health." Giselle testified that Amy has Chiari malformation, hydrocephalus, and is expected to have many surgeries during her life, and that Renae is only able to keep up with Amy's medical needs with Giselle's help, including waking Renae up and driving her to appointments.

Giselle testified that in late September 2020, she went to pick up the girls at Renae's house after receiving a call from one of Renae's neighbors, and when she

4

arrived, Renae looked "kind of like out of it. She just ha[d] a blank stare on her face." Giselle believed that Renae could not care for the girls and that it was better for Amy and Elise to go with Giselle, and Martina went to Renae's sister, Amanda. The next day Renae picked up Amy and Elise from Giselle and took them home, and Martina was still with Amanda. According to Giselle, a few hours later, she received a call from one of Renae's neighbors, and when Giselle went to Renae's home, Renae was asleep inside, but Amy and Elise were at a neighbor's house. Giselle testified that she took the girls back to her home because Renae "had left them with the neighbors for hours, like, [and she] didn't know if she was going to keep them or if she was going to send them back there[.]" According to Giselle, she believed the three girls to be in danger when Renae left them with an unknown neighbor for several hours.

Giselle testified that Renae had told her she was diagnosed with bipolar disorder and that she was on medication. Giselle had picked up Renae's prescriptions because Renae did not have a car, and according to Giselle, when Renae did not take her medication, she was disorganized, she could not think straight, and she was not focused on what she needed to do. According to Giselle, Renae had told her she had used methamphetamine and kratom. Giselle also testified that sometimes Renae had left Martina in a playpen for hours with a soiled diaper.

According to Giselle, since the CPS suit began, Martina had stayed with Renae's sister Amanda, Martina is happy and "running around[]" there, and Giselle

5

had no concerns about Martina in Amanda's home. Giselle testified that she believed Martina was receiving appropriate parenting at Amanda's house, and that staying with Amanda and her husband would be in Martina's best interest. According to Giselle, she had had concerns about Renae's ability to take care of Martina for about two years, and Giselle would be concerned about Renae caring for Martina if she were returned to Renae's home. Giselle believed that Renae failed to feed Martina "[a] lot[]"—three or four times a week. Giselle also testified that about half of the time she was at Renae's home, Martina was not groomed or clean.

Testimony of Amanda

Amanda testified that she was Martina's aunt, and Martina had been living with her, her fiancé Sheldon, and her thirteen-year-old son Keifer since the CPS case began. Amanda testified that she and Sheldon were both paramedics. According to Amanda, Keifer and Martina were bonded, and they do everything together, but they each have their own room. Amanda testified that she and Sheldon do "interactive things" with Martina, such as painting, building things, and puzzles.

According to Amanda, she had known for a while that Martina needed to live somewhere other than with Renae because Renae would often call her to take all three girls, Renae's house was overcrowded and unsanitary, and the girls had to sleep in the living room. Amanda testified that when the CPS case began, Renae was to have visitation with Martina at Amanda's home, but Renae did not come to the

6

house, and when visitations were later arranged to occur at the CPS office, Renae attended some visits and sometimes did not attend for months. Amanda testified that she did not see any change in Martina's behavior when Renae skipped visits. Amanda testified that she has bipolar disorder herself, and she sees a psychiatrist and takes medication. She also testified that she had talked with Renae and offered to help, support, and guide her on mental health issues. Amanda stated that she had not seen any changes in Renae that suggested Renae had sought help. Amanda had heard Renae call her children "pod people" and say "they weren't her real kids, [and] that her real kids aren't alive anymore[.]" Amanda also testified that before Martina was born, she saw Renae buy methamphetamine.

Amanda testified that it was in Martina's best interest for Martina to be adopted by Amanda and her fiancé. Amanda did not want Martina near Renae or being influenced by Renae.

Testimony of Sheldon

Sheldon testified that he was engaged to Amanda and that Martina had been living with them for a year. He also testified that he and Amanda were both paramedics and he had recently returned to teaching paramedics and EMTs so he could be home more. He further testified that his employment had been stable since he was eighteen years old. According to Sheldon, his home with Amanda has three bedrooms, and Martina has her own room.

Sheldon testified that he had observed Renae with her children, and he had seen her "pop" or spank Martina. He also believed that Martina was not bathed as often as she needed to be. When he and Amanda went to pick up Martina at Renae's house before removal, he saw that the house and children were dirty, there was no sleeping space for the children, and he testified that many times when he and Amanda picked up Martina, it was "for the assistance of [Renae]." One time he observed Renae use kratom when Amy was in the hospital. Sheldon also had concerns about Renae's mental health based on the frequency of her need for help taking care of her children.

Sheldon testified that Martina was doing "amazing[,]" her vocabulary and language skills were growing, and she had become less scared and shy. He also testified that Martina was in pre-K and was making progress in school. According to Sheldon, he and Amanda received support from friends and his parents. Sheldon testified that he and Amanda had made Martina available for all visitations with Renae except one, and that Renae missed visitations for a while. Sheldon believed it was in Martina's best interest for Renae's parental rights to be terminated. Sheldon testified that he and Amanda wanted to adopt Martina because Martina needed consistency and normalcy. According to Sheldon, he and Amanda intended to facilitate Martina's relationship with her siblings.

8

Testimony of Renae

Renae testified that she was Martina's mother, Martina was four years old, and Renae was married to Teddy. She also testified that she was a driver for Pizza Hut, where she had worked off and on for six or seven years, she was not working at the time of removal and had been living on child support, but she was no longer receiving those payments because Amy and Elise's father had primary custody of Amy and Elise. Renae testified that her tips working for Pizza Hut could range from $50 to $300 a day, and she could pay her rent "[m]ost of the time[.]" Renae stated that she did not know where Teddy was, she had last spoken with him about a year before trial when she filed for divorce, and Teddy had signed a denial of paternity of Martina. According to Renae, Teddy had never seen Martina. She agreed she "filed on" Damon so his name could be on Martina's birth certificate, but he did not sign paperwork saying he was the father, there was no DNA testing, Renae did not pursue adjudicating him as the father, and Damon had not seen Martina for more than three years.

Renae explained that at the time of removal, she had a "mental breakdown" after learning something about Amy's health, and she was disoriented and confused. Renae agreed that she took kratom for pain every day, which she testified was "an all-natural herb." She testified that it had been years since she had used methamphetamine, and it had been about a year-and-a-half since she had smoked

marijuana. Renae agreed that in 2014, she tried to kill herself by overdosing on medication because she was "in a very bad place mentally[]" due to postpartum depression and because her "ex had left her." She agreed that she had a prior involvement with CPS in 2014, but she worked her required services, which included addressing marijuana and methamphetamine use. Renae did not remember any other CPS cases until this one in 2020 involving Martina, but she agreed allegations were made to CPS about her having a dirty house, using drugs, and abusing the children, and one time she had to take a drug test that she passed. Renae testified that her home was cluttered for a while after she moved items from storage, but the home was clean and organized at the time of removal and she believed it had been "ever since." Renae testified that she had never called her children dead, aliens, or hypnotized. According to Renae, she bathed the children every day or every other day, and her home had a bed for each child.

Renae agreed she had been diagnosed with bipolar disorder, she had taken medication for anxiety for a while, but at the time of trial, she was not taking any medication. Renae also testified later that "[h]e never said I was bipolar. He put me on medicine[]" and that "[h]e took me off [the medication] and said I was okay." Then during other testimony at trial, Renae said she was under the care of a physician, she was taking medication, and she intended to keep taking the medication if her doctor prescribed it for her. Renae stated that she had removed

10

toxic people from her life, she had worked through many things, and she was seeking help through online support groups.

Renae agreed that she had not been to every court hearing in the case. She agreed she had been given a family service plan, but she testified that she had not taken a parenting class, had not completed a psychological evaluation, had not had individual counseling, had not had a drug and alcohol assessment, and had not taken a drug test—and that she had completed nothing on her family service plan. Renae remembered telling her caseworker that she was not going to complete services. Renae testified that she had received a couple of texts about drug testing, but she did not submit to a drug test, although she was selling her plasma twice a week. Renae testified that the Department had not sent her a referral for a psychological evaluation and she "wasn't able to[]" participate in individual counseling. She also agreed that she had not provided a rental agreement to the Department, but she said that was because she "wasn't asked for one." She testified that she was living in a friend's trailer where she did not pay rent or utilities nor was there a rental agreement, and the owner agreed to let her live there free in exchange for her "fixing it up and making it livable." She agreed that she had missed some visitations with Martina, but that was because she was sick or had car trouble, or she called to cancel, or the CPS office was closed due to bad weather. Renae testified that when she saw Martina at visitations, Martina ran to her excitedly, she smiled, and she grabbed onto Renae.

11

Testimony of the Court-Appointed Special Advocate

The Court-Appointed Special Advocate ("CASA") testified that she had been assigned to this case the entire time. The CASA testified that at first, Martina was shy and hesitant, but that she had become open and friendly. She had observed Martina in Amanda and Sheldon's home and saw that they put Martina's safety and well-being first and were very calm when they needed to redirect Martina's behavior. The CASA testified that Renae was inconsistent in communicating with the CASA. According to the CASA, she explained to Renae that the family service plan was court-ordered, but Renae "just didn't feel it was needed." Renae had visitation with Martina at first, but there was about a six-month gap before she resumed visits. The CASA testified that she had not observed Renae's visits with Martina nor had she visited Renae's home. The CASA texted Renae at least once a month, but she did not always receive a response, and there was about a four-month period when she did not hear from Renae. The CASA recommended that Renae's parental rights should be terminated and that Amanda and Sheldon be allowed to adopt Martina. The CASA testified that she recommended termination because "the inconsistency would create an unsafe environment for [Martina]."

Testimony of the CPS Caseworker

A caseworker for CPS ("Caseworker") testified that she had been assigned to Martina's case for about ten months. The Caseworker agreed that Teddy, who was

married to Renae, could not be Martina's father "logistically[,]" and that Damon, whom Renae named as Martina's father, had told the Caseworker he was not Martina's father, he wanted nothing to do with the case, and he wanted her to stop calling him. According to the Caseworker, when she was first assigned to the case in February 2021, she called Renae, left text messages, and she received no reply, but later in July, Renae reached out to the Caseworker. The Caseworker testified that she set up services for Renae and discussed services and visitation, but Renae had not completed any services. The family service plan required a psychological evaluation, parenting classes, Parent Collaboration Group, drug and alcohol assessment, random drug screenings, maintaining contact with the Department, and providing proof of stable housing. The Caseworker testified that Renae "told [her] more than once that she was not going to do services because she felt that CPS should not be involved and that they should not have ever taken [Martina]." According to the Caseworker, she had received verification from all the service providers about the services that were set up for Renae. Visitation was set up to occur every week, and between February and July of 2021, Renae's attendance at visitation was "sporadic[,]" she made eleven or twelve visits, and the Caseworker was unable to contact Renae to set up more visits. The Caseworker contacted Renae at least once a month for drug testing, the Caseworker had never received any drug testing results, and she had ongoing concerns about Renae's drug use. The Caseworker observed

"[a]t least ten[]" visits between Renae and Martina, and she saw that Martina ran to her mother smiling, and Renae was attentive, engaged, and active when playing with Martina. The Caseworker did not visit Renae's home nor speak with Renae's employer.

The Caseworker stated that termination of Renae's, Teddy's, and Damon's parental rights was in Martina's best interest because, at the time of trial, Martina had permanency and consistency in her placement and because Renae had done nothing to complete her services or alleviate ongoing concerns. The Caseworker described her concerns to the trial court, which included concerns after talking with Renae that the conversation went in circles and Renae did not appear to be clearly processing what the Caseworker was saying. The Caseworker did not remember that Renae ever reached out to her and never completed her required services. The Caseworker also testified that the original allegations of neglectful supervision were not resolved.

The Caseworker testified that she visited the home where Martina was placed, and she saw that Martina was very happy, the caregivers were attentive, and it was a "wonderful environment" for Martina. According to the Caseworker, the foster parents were meeting Martina's dental and medical needs, and she had no concerns about the foster parents.

The trial court took judicial notice of the record. Exhibits admitted at trial included the family service plans for Renae and for Teddy, and a Status Hearing Order signed January 4, 2021, ordering compliance with the service plans. The trial court found that both Teddy and Damon failed to answer after having been properly served and they were in default, and the court terminated their parental rights to Martina. The court also found by clear and convincing evidence that termination of Renae's parental rights was in Martina's best interest and found that Renae had endangered and constructively abandoned Martina and had failed to complete court-ordered service plans. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2). Renae timely appealed.

## Issue

In a single issue, Appellant argues that the evidence was not legally or factually sufficient to support the trial court's finding that termination of her parental rights was in Martina's best interest. Appellant argues the evidence is uncontroverted that Martina wanted a relationship with her mother because Martina was happy around her mother, and that Renae was engaged and attentive during her visits with Martina. Appellant also argues that, despite the allegations that precipitated the case, Renae had submitted to psychiatric evaluation, no medications were prescribed, she had not used illegal drugs, she was not involved in criminal activity, and she had removed all toxic people from her life. Appellant argues "[t]here was an option for

15

the child to remain in the current placement with [] relatives without termination[]" and that termination of Renae's parental rights presents a danger to Martina's emotional well-being. According to Appellant, the best-interest evidence was scant, and there was no compelling benefit to severing Renae's parental rights.[4]

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the

---

[4] Appellant does not challenge the sufficiency of the evidence to support the trial court's statutory predicate findings.

16

factfinder resolved the disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

Best Interest of the Child

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528,

533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). In a bench trial, the trial court is the sole judge of the weight and credibility of the evidence and of the witnesses' testimony. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). When determining the best interest of the child, a court may consider circumstantial and direct evidence, subjective factors, and the totality of the evidence, and evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *See In re C.H.*, 89 S.W.3d at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable time period; whether the child's family demonstrates adequate parenting

skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family member and friends is available to the child. Tex. Fam. Code Ann. § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116.

The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse of the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor

may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Because stability and permanence are important in a child's emotional and physical development, termination of parental rights may be in the child's best interest when a parent cannot provide a stable environment or a reliable source for food, clothing, shelter, and emotional support. *See In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure a parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). A parent's drug use, criminal history, and employment and housing instability before and during the case create a course of conduct from which the factfinder can determine that the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, not pet.) (mem. op.). A

factfinder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicated the parent was avoiding testing because she was using illegal drugs. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A parent's mental illness is not a ground for terminating the parent-child relationship, but untreated mental illness or a parent's failure to take required medication can result in neglect or expose a child to endangerment, and it is a factor the court may consider. *See In re J.S.*, No. 09-20-00294-CV, 2021 Tex. App. LEXIS 4574, at *28 (Tex. App.—Beaumont June 10, 2021, no pet.) (mem. op.) (citing *In re L.J.*, No. 09-19-00457-CV, 2020 Tex. App. LEXIS 4271, at *14 (Tex. App.—Beaumont June 9, 2020, no pet.) (mem. op.)); *In re P.H.*, 544 S.W.3d 850, 857-58 (Tex. App.—El Paso 2017, no pet.); *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

## Analysis

We first note that the trial court found that Renae had endangered Martina under subsections D and E, had constructively abandoned Martina under subsection N, and failed to comply with the service plan under subsection O. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O). Renae does not challenge these findings on appeal. The evidence supporting the statutory grounds for termination may also be used to support a finding that termination of the parent-child relationship is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 28.

21

As for the desires of the child, the Caseworker testified that when visitations between Renae and Martina occurred, Martina appeared happy, and Renae played and interacted with Martina attentively. Both Amanda and Sheldon testified that Martina was doing well in their home and had bonded with their son. There was no additional evidence presented about the actual desires of the child. This factor does not weigh heavily in favor of or against terminating parental rights.

Regarding Martina's emotional and physical needs now and in the future, and the possible emotional and physical danger to her now and in the future, the record included reports that Renae often left her children with neighbors or unattended. Sheldon testified that Martina was not bathed frequently enough, and the home was cluttered and dirty. Giselle testified that at times Renae had left Martina in a playpen for hours with a soiled diaper. Amanda testified that she did not see any change in Martina's behavior when Renae skipped visits. She also testified that Renae had called her children "pod people" and that they were not alive or were not real people, although Renae denied that she said these things. The trial court was entitled to find that this factor weighed in favor of termination.

Regarding Renae's acts or omissions and her parental abilities, evidence showed that Renae had a history of drug abuse, prior history with CPS interventions, a criminal history, and she had a suicide attempt. She testified inconsistently about whether she had been diagnosed with bipolar disorder and whether she was seeking

22

professional care, and whether she was taking medication. She testified that she used kratom daily to self-medicate. Giselle testified that when Renae did not take her prescribed medication, Ranae was disorganized, she could not think straight, and she was not focused on what she needed to do. Renae failed to see Martina for four months during the pendency of the case. She failed to submit to drug testing during the pendency of the case, and the trial court could have inferred that Renae was continuing to use drugs. *See In re E.R.W.*, 528 S.W.3d at 265. Renae failed to provide proof of a stable and safe home and was living in a friend's trailer rent-free because the owner had agreed to let her fix it up and make it "livable." Renae testified that she worked part-time as a driver for Pizza Hut, and she had worked for them "[o]ff and on" in past years, but she could not say how much she made working for Pizza Hut. The Caseworker and CASA both testified that Renae often failed to respond when they tried to communicate with her. Renae failed to complete any services and never addressed the reasons for Martina's removal. On this record we conclude that the trial court could have reasonably disbelieved Renae and found that Renae's acts and omissions weigh heavily in favor of terminating her parental rights. *See In re L.J.*, 2020 Tex. App. LEXIS 4271 at *17 (explaining that the impact of a parent's mental illness and failure to take prescribed medication are relevant factors in a best-interest analysis); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to

23

comply with a family service plan support a finding that termination is in the best interest of the child.").

Having considered the evidence related to best interest and deferring to the trial court's determinations on witness credibility, the trial court's resolution of conflicts in the evidence, and the weight to be given the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in Martina's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Renae's parental rights is in Martina's best interest, and we overrule Appellant's issue.

Having overruled Appellant's sole issue, we affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 4, 2022
Opinion Delivered May 19, 2022

Before Golemon, C.J., Horton and Johnson, JJ.